Filed 4/22/15  P. v. Jackson CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>GREGORY JACKSON,<br><br>　　　Defendant and Appellant. | B256282<br><br>(Los Angeles County Super. Ct.<br>　No. MA057531) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kathleen Blanchard, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Daniel C. Chang, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury found defendant and appellant Gregory Jackson guilty of forcible rape (Pen. Code, § 261, subd. (a)(2) [count 1]),[1] two counts of forcible oral copulation (§ 288a, subd. (c)(2) [counts 2-3]), two counts of criminal threats (§ 422, subd. (a) [counts 4 and 6]), and assault with intent to commit rape or oral copulation (§ 220, subd. (a)(1) [count 5]). The jury found true the allegations that defendant personally used a deadly and dangerous weapon in commission of the crimes charged in counts 5 and 6. (§ 12022, subd. (b)(1).)

In a bifurcated proceeding, the trial court found true as to counts 1-3 that defendant suffered a prior sexual offense conviction for purposes of the one strike law. (§ 667.61, subds. (a) & (d).) As to all counts, the court found that defendant suffered three prior serious and/or violent felony convictions within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and three prior serious felony convictions within the meaning of section 667, subdivision (a)(1).

Defendant was sentenced to an aggregate term of 392-years-to-life. As to counts 1-3, the trial court imposed consecutive terms of 25-years-to-life pursuant to the one strike law, tripled to 75-years-to-life under the three strikes law. In counts 4-6, defendant was sentenced to consecutive terms of 25-years-to-life. The sentences in counts 1-6 were each enhanced by 15 years based on the three serious felony prior convictions. The sentences in counts 5 and 6 were each also enhanced by one year for use of a deadly or dangerous weapon.

Defendant contends: (1) the trial court abused its discretion in excluding evidence of prior misdemeanor prostitution convictions of a complaining witness; (2) the trial court abused its discretion by excluding evidence of other prior misdemeanor convictions and an arrest suffered by complaining witnesses; (3) the trial court abused its discretion by requiring that defendant present evidence of conduct evidencing moral turpitude rather than the misdemeanor conviction of a witness; (4) the prosecutor improperly questioned

---

[1] All further statutory references are to the Penal Code, unless stated otherwise.

2

defendant on cross-examination and committed prosecutorial misconduct in her closing argument; (5) the errors identified in defendant's first four contentions prejudiced defendant in the aggregate; (6) the evidence was insufficient to support one of three prior serious felony enhancements; (7) the trial court erred when it failed to stay the sentences on the criminal threats convictions in counts 4 and 6 pursuant to section 654; (8) the evidence was insufficient to support defendant's conviction for criminal threats in count 6; and (9) the evidence was insufficient to support the deadly or dangerous weapon findings in counts 5 and 6.

The Attorney General concedes, and we agree, that there is insufficient evidence to support one of the prior serious felony enhancements. We further agree with defendant that the sentence imposed in count 6 must be stayed pursuant to section 654. Additionally, our review of the record disclosed that the abstract of judgment did not conform to the oral pronouncement of judgment as to the sentences in counts 1-3. After reviewing the parties' supplemental briefing on this issue, we conclude that the abstract of judgment must be corrected as to counts 1-3 to reflect that the sentences were imposed under the one strike law as well as the three strikes law, and that the indeterminate term imposed on those counts is 75-years-to-life. In all other respects the judgment is affirmed.

## FACTS

*Prosecution*

### Counts 5 & 6: Victim Tammy J.

Tammy J. was driving her truck alone on Sierra Highway during the evening on September 16, 2012. She pulled over because the truck stopped running. Tammy checked the engine and noticed that it was hot, so she stood on the side of the road to wait for it to cool down.

3

A van drove past her and made a U-turn. The driver, who Tammy later identified as defendant, pulled up behind her truck. Defendant got out of the van and approached her. Tammy was apprehensive about defendant because it was dark and the area was "not that great."

Defendant was pleasant and offered assistance. Tammy did not have her phone with her, so she asked to borrow defendant's phone. He said that the battery had died, and quickly put his cell phone in his pocket.

Tammy suspected that she had run out of gas, though she could not be sure because the gauge was broken. Defendant said that he would get her more gas if she had a gas can. Tammy retrieved a red plastic two-gallon gas can with a black mark on it from the back of her truck and handed it to defendant. Defendant said that he would go get the gas, but that he needed to stop at the bank first.

Defendant put the gas can in his van. He told Tammy that he was worried about leaving her there because it was dark and the area was not safe. He told her that he was a good guy and just wanted to get her truck running again. Nervous about the area and the darkness, Tammy got into the van with defendant.

Defendant drove to a parking lot in an industrial area and parked. The area was dimly lit and many of the businesses were closed. There were no other people around.

Defendant got out of the driver's seat, put his leg between Tammy's legs, and placed his left hand around Tammy's throat. He held "what [Tammy] thought was a knife to [her] neck, something sharp . . . ." It was dark in the van and she could not see. Defendant said, "Bitch, get in the back and get naked." Tammy asked if he was joking. He responded, "Bitch, get in the back and get naked; otherwise, I'll kill you." Tammy was "scared to death." She tried to think of ways to escape, and reached for the door handle. Defendant had put the knife down behind him, but when she reached for the door he picked it up again and held it to her neck. He threatened, "Bitch, get in the back and get naked; otherwise I'm going to stab you." Defendant put the knife down a second time. Tammy got out of the van and ran, screaming for help. Tammy had been wearing flip flops, but they came off as she ran for help. She left her gas can in defendant's van.

4

Tammy ran to a street and tried to flag down help, but no one stopped. She ran a little over half a mile to a Panda Express. She did not look back as she was running. The restaurant was closed, but there were two women inside cleaning. Tammy banged on the door and asked them to call 911. The women called the police but did not let her inside the restaurant. Tammy sat outside at a table for approximately 45 minutes until police arrived.

When Los Angeles County Sheriff's Deputy Carl Forbes arrived at the Panda Express, Tammy was out of breath, crying, and hysterical. Her hair was "messed up," and she was not wearing shoes. Deputy Forbes spoke with Tammy for about 30 minutes, and then drove her to where her truck was parked on the side of Sierra Highway. It was near a closed car dealership. There were no open businesses in the area. Deputy Forbes had Tammy retrace the route that defendant took to drive them to the industrial area. She took Deputy Forbes to the spot where defendant parked the van and assaulted her. The industrial area was deserted and not as well-lit as Sierra Highway. They found Tammy's flip flops nearby.

At trial, Tammy was shown photographs of a gas can recovered from defendant's van. She testified that it was "definitely" hers.

Tammy did not take $50 from defendant, nor did she run out of defendant's van with the money.

### Counts 1-4: Diedra M.

Diedra M. was drinking beer in a bar parking lot while watching live music during the evening of September 26, 2012. Diedra had parked her Ford Taurus at Village Grill, across the street from the bar. After drinking for about an hour, Diedra decided to go home, but realized she was too drunk to drive. She did not call her husband because she did not have a cell phone or money to make a call. Diedra did not want to walk home because it was about a mile and a half away, so she decided to hitchhike. She made eye

5

contact with defendant, who was driving a van on Sierra Highway. Defendant stopped to pick her up.

Diedra got into the van and told defendant where she was going. He said he would give her a ride, but that he needed to stop somewhere first. Defendant drove the van to a house, where he parked. There were no streetlights in the area. Cars occasionally drove past, but there was no one else around. It was dark inside the van.

Defendant said, "Bitch, get in the back and take your clothes off." Defendant told Diedra, "I don't play games." His hand was positioned on the side of his seat as if he was holding a weapon. Diedra was afraid that defendant would become violent. It was too dark for her to tell for certain if he had a weapon. Diedra took off all her clothes. Defendant told Diedra he wanted to look at her. He used a lighter to see her, and asked her how old she was. When she responded he seemed disappointed. Diedra complied with defendant's direction to get into the back of the van. Diedra was afraid that defendant would hurt her if she did not obey him. She told him she did not want any problems, and that he did not have to do what he was doing. Defendant took off his pants and demanded that Diedra "suck his dick." She complied because she did not want to get hurt. Defendant repositioned himself and demanded more oral sex. This continued for "a long time." Defendant repositioned himself multiple times during the oral copulation. Diedra began crying. She asked defendant to let her go. He replied that "he would let [her] go when [he] was finished and that he didn't know [why she] was crying because he was going to pay [her]." She said she did not want to be paid, she just wanted him to let her go. Defendant said he wanted to perform oral sex on her. She refused to lie down because she "was scared [she] wouldn't get back up." She told defendant she was afraid. She then sat with her legs open and defendant touched her vagina once with his mouth. She told him that she was scared repeatedly. She pleaded for him to stop and told him that she had children. Defendant replied, "Shut that shit up." He said he would let her go, but she had to finish first.

Defendant demanded sexual intercourse. Diedra told him she was married, and asked him to use a condom. Defendant pulled out a condom from somewhere beside

6

him.  Diedra continued to cry.  Defendant did not seem to care and kept telling her to stop talking.  Diedra could not see a way to escape.  Defendant was big, and he was in between her and the door.  Defendant put on the condom.  He inserted the tip of his penis into her vagina.  Diedra refused to lie down.  He was unable to fully insert his penis into her because she kept moving her body.

Defendant lost his erection.  He sat down next to Diedra and demanded oral sex again.  She was crying so hysterically that she could not perform oral sex because her nose was filled with mucus.  Defendant gave her his shirt to blow her nose in.  He asked her to talk to him, and sat down next to her.  He told her "that he had to finish what he was doing because it mess[ed] with him physically if he [didn't] complete it."  He said he would let her go.  Diedra responded that if he was going to let her go he should give her bra to her.  Defendant gave Diedra her bra.  She then asked for her shirt.  Defendant gave it to her and said, "See, I'm going to let you go."  Diedra then said that if he was going to let her go he should give her pants back, and defendant got very angry.  He said, "Bitch, you going to suck my dick till I come or I'm going to cut your throat and slash your face and watch you bleed."  He told her he liked to "watch[] bitches bleed."  Diedra thought she was never going to see her children again.  She thought she was going to die.

When defendant leaned back to receive more oral copulation, Diedra escaped through the driver's side door.  Defendant came to the front of the van and told her to get in.  She said that she was not getting in.  He threw her clothes out of the van.  Diedra went to the road quickly and flagged down a man in a car.  She was terrified.  Defendant started the van and left.  Diedra told the man she had been raped and asked if he could take her back to her car.  He called the police, but did not let her into his vehicle.

Los Angeles County Sheriff's Deputy Melissa Navarro responded to the call and spoke with Diedra.  Diedra was upset and crying, and had difficulty speaking.  It took about 20 minutes for her to calm down enough to talk to Deputy Navarro.  After she calmed down, Diedra relayed the events to Deputy Navarro.  Deputy Navarro smelled alcohol on Diedra's breath and believed that she had been drinking.  The deputy searched

7

Diedra and found loose change and her California identification card. The deputy did not find a $20 bill in Diedra's possession.

Deputy Navarro drove Diedra home, and then drove to the Village Grill parking lot to try to find Diedra's car. She observed a single car parked in the lot, which was later determined to be a 1999 Ford Taurus.

Diedra testified she was not working as a prostitute on the night of the incident. She did not discuss performing oral copulation on defendant in exchange for $20, and she did not smoke crack cocaine with defendant in his van.

**Defendant's Arrest, Search of the Van, and Scientific Evidence**

At approximately 3:00 a.m. on the day after Diedra was sexually assaulted, Deputy Forbes saw defendant driving a vehicle matching the description that Tammy had given of defendant's van. Deputy Forbes initiated a traffic stop, spoke with defendant, placed him under arrest, and impounded the van.

Los Angeles County Sheriff's Department Sergeant Troy Bowser searched defendant's van. Sergeant Bowser recovered a box of condoms from the center seat row, a used condom from the rear map pocket of the front passenger seat, and a red two-gallon gas can that Tammy later identified as belonging to her.

Los Angeles County Sheriff's Department criminalist Leslie Thompson inspected the used condom and collected cellular material. She collected semen in an exterior swab of the condom and seminal fluid on an interior swab. Ms. Thompson determined there was a major contributor and a minor contributor to the sample obtained from the condom. Defendant's DNA profile matched the profile of the major contributor. The profile of the minor contributor matched Diedra's DNA profile.

8

**Testimony of Maria H.**

On February 22, 1991, Maria H. was 16 years old.[2] She was walking with her friend, Jacqueline, when defendant stopped them. Defendant asked if they wanted "a ride." They wanted a ride home, so they said yes and got into his vehicle. Defendant drove the girls to the desert. He told them he had a gun, and pressed something metal that felt like a gun to the back of Maria's head. He ordered Jacqueline to get out, and then drove Maria further into the desert. Defendant stopped the vehicle, put his arm across Maria's throat, and threatened to kill her. He put his mouth on her vagina and inserted his penis into her vagina. When he was done he let her go. He said something like, "I'll give you a head start." Maria ran to a road for help. A passerby called the police.

*Defense*

Defendant testified on his own behalf. Early one evening in September 2012, he was driving his father's van on Sierra Highway, intending to get high with a prostitute. He had crack cocaine in a toolbox inside the van. Defendant saw Tammy walking on the side of the road toward a motel. She waved at him, so he thought she was a prostitute.

Defendant pulled up next to Tammy and she immediately got into the van. He said he was "looking to party" and asked her what she was "into." Tammy said she was into "speed." Defendant told her he did not have speed, and offered her money. She agreed. Defendant gave her two $20 bills and one $10 bill for a total of $50.

Tammy told him where they could go to get speed, but it was far away, so defendant parked in a factory parking lot instead. He said, "[C]ome on baby. Let's get in the back." Tammy agreed. Defendant went to the back of the van and sat down. He

---

[2] Maria testified at trial under the name "Maria A."

9

heard the front passenger door slam, so he went to the front of the van to see what was going on. He saw Tammy running away.

On another evening in September 2012, defendant drank alcohol and used crack cocaine at the Shadow Park Motel with a group of men. He was driving out of the parking lot when he saw Diedra in front of the motel. She was standing with some other girls, one of whom he knew as "Black." Several months earlier, defendant had given Black drugs in exchange for sex. Defendant waved for Diedra to get in his van. He told her he wanted to "party." She said she did, too, and asked, "[W]hat you got?" Defendant told her he had crack cocaine. Diedra said, "[A]ll you have to do is give me a hit and I turn into a free mama." Diedra then indicated she was skilled at oral copulation.

Diedra told defendant where to drive. After defendant parked the van, they sat on its floor, smoking cocaine, for about an hour and a half. Diedra orally copulated him, but defendant did not ejaculate. He never inserted his penis into her vagina.

Defendant and Diedra consumed all of defendant's $100 worth of cocaine. Defendant refused to get more cocaine. Diedra swore at him and said, "I'm going to get you." Defendant said he would give her money to buy more drugs. She became very agitated and paced back and forth in the van. Diedra got out of the van, but continued swearing at defendant. He threw $20 at her, but she threw it back at him. Defendant drove away.

Defendant did not believe there were any condoms in the van. If there were condoms, they might belong to his father. Defendant knew a used condom was found in the van, but denied using a condom with Diedra. When questioned whether it would surprise him to learn that the used condom was found to include both his and Diedra's DNA, he responded, "It would surprise me because it's impossible." Although Diedra performed oral sex on defendant, he never performed oral sex on her, never penetrated her vaginally, and he did not achieve orgasm. He did not have sexual intercourse with prostitutes because he did not want to catch any diseases. Defendant did not threaten Diedra, or become physically violent with her. He did not have any weapons in the van.

10

Defendant testified that he was convicted of forcible rape while acting in concert in 1991.  The victim was a prostitute named Cynthia J.  He was convicted for the forcible rape of Maria, a 16-year-old prostitute, also in 1991.  Defendant denied having sex with Maria, but admitted that he pleaded guilty to raping her by force.

## DISCUSSION

### *Exclusion of Diedra's Prior Misdemeanor Convictions for Prostitution*

Defendant contends that the trial court erred in excluding Diedra's two 1997 misdemeanor convictions for prostitution.  Defendant further contends that the trial court erred when it "appeared" to exclude evidence that Diedra had worked as a prostitute in the recent past, and specifically on any day other than the night the crimes took place.  He argues the evidence was admissible to impeach Diedra's credibility.  We agree with the Attorney General that these contentions are both forfeited and fail on the merits.

**Relevant Proceedings**

Before the jury was empanelled, the prosecutor moved to exclude evidence of Diedra's two misdemeanor convictions for prostitution (§ 647, subd. (b)), which she suffered in September and October of 1997.  The prosecutor argued the misdemeanor convictions should be excluded because they were too remote in time.  The trial court asked defense counsel whether he intended to impeach Diedra with the two convictions:

"[Defense counsel]:  Yes, your honor.  The defense in this case essentially is that Diedra was acting as a prostitute on the night in question, that the business transaction went bad.  Consequently, she made up lies about [defendant], about what he had done.  [¶]  And I think that even though they're old, . . . she will be asked on the night in question was she working as a prostitute.  I believe from her previous statements and testimony she will say no.  [¶]  I would like to ask her, have you ever worked as a

11

prostitute. I don't know what she'll say to that question. If she says no, she hasn't, I would like to use those convictions to impeach her. If she says yes, she has, then I don't need to get into those specific convictions.

"The Court: So you are not actually seeking to introduce them as crimes of moral turpitude; you're actually talking about [Evidence Code section] 1101 type of evidence as to the victim that you're talking about her actions in conformity with prior actions, correct?

"[Defense counsel]: Yes. I would agree with that, Your Honor, but having said already if she denies having worked as a prostitute, I would then want to use those priors for impeachment purposes."

The trial court then gave the prosecutor the opportunity to respond.

"[Prosecutor]: I would just add, your honor, that this statement that the defendant makes, he declares that both of the victims were prostitutes at the time of the assaults on two separate occasions. [¶] I believe that counsel asking Diedra if she was working on the evening of the assault as a prostitute is appropriate, but anything beyond that I believe is [subject to Evidence Code section] 1101 and inappropriate.

"[Defense counsel]: Your Honor, factually, so you know, my understanding of the discovery is that Diedra essentially waived down [defendant]. She flagged him down, asked him for a ride. [¶] . . . She claimed she drank too much alcohol that night at a bar and did not want to drive her car home. She was hitchhiking and flagging down motorists. [¶] I would think that her knowledge about that, things that can happen and do happen, is related to her prior experience working as a prostitute, and I would think that it could go to state of mind on her part as to what she was doing and what concerns, if any, she had while doing it.

"The Court: Okay. I honestly don't follow you there. I do think that in analyzing whether or not she was working as a prostitute that night is certainly relevant. [¶] You can cross-examine her in terms of her actions to support or undermine whatever her statement is, but the fact that someone suffered . . . two misdemeanor convictions for prostitution 17 years ago, I think that the probative value is very minimal. [¶] In

12

addition, even trying to get there by asking her, well, isn't it true that you have been a prostitute in the past, I don't see what the relevance of that that [*sic*] is as to what happened on that night. So the probative value seems very minimal to me. [¶] On the other hand, the prejudicial effect of confusing the issues for the jury, and we are talking about something that is quite remote 17 years ago, the prejudicial effect in terms of the undue consumption of time and confusion of the issues does appear to me to substantially outweigh any minimal probative value. [¶] Therefore, under Evidence Code section 352, I will grant the People's motion to exclude any reference to those prior misdemeanor convictions from 1997."

Later, the court reiterated its ruling:

"The Court: Well, again, counsel, I said your questioning as to what [Diedra] was doing that night and what she said that night, that's all admissible. It's 17 years ago that … [¶] —we're not getting into.

### Legal Principles

Evidence the victim participated in a form of prostitution is evidence of conduct involving moral turpitude, which is admissible for impeachment purposes. (*People v. Chandler* (1997) 56 Cal.App.4th 703, 708-709 (*Chandler*).) Court records of misdemeanor convictions are also admissible to prove both "the fact of conviction, [and] … that the offense reflected in the record occurred" under an exception to the hearsay rule. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1461 (*Duran*); see Evid. Code, § 452.5.) However, Evidence Code sections 782 and 1103, subdivision (c), place limits on how and under what circumstances a victim's prior sexual behavior can be admitted in a trial of sexual assault charges. (*Chandler*, *supra*, at p. 707.)

"[Evidence Code] [s]ection 1103, subdivision (c), provides that a defendant cannot introduce opinion evidence, reputation evidence, and evidence of specific instances of the alleged victim's previous sexual conduct with persons other than the defendant to prove the victim consented to the sexual acts alleged. In adopting this section the Legislature

13

recognized that evidence of the alleged victim's consensual sexual activities with others has little relevance to whether consent was given in a particular instance. [Citation.]" (*Chandler*, *supra*, 56 Cal.App.4th at p. 707, fn. omitted.) Although admission of the victim's past sexual conduct for purposes of proving consent is strictly precluded, Evidence Code section 1103, subdivision (c)(4), allows the admission of evidence of prior sexual conduct relevant to the credibility of the victim. (*Ibid*.)

"Evidence Code section 782 specifies a procedure requiring an in camera review of the proffered evidence to diminish the potential abuse of section 1103, subdivision (c)(4)." (*Chandler*, *supra*, 56 Cal.App.4th at pp. 707-708.) "[Evidence Code] [s]ection 782 requires that the testimony be preceded by a written motion by the defendant accompanied by an affidavit containing an offer of proof. If the trial court finds that the offer of proof is 'sufficient,' it must conduct a hearing out of the presence of the jury and allow the alleged victim to be questioned "'regarding the offer of proof . . . . At the conclusion of the hearing, if the court finds that evidence proposed to be offered by the defendant regarding the sexual conduct of the complaining witness is relevant . . . and is not inadmissible pursuant to Section 352 of [the Evidence Code], the court may make an order stating what evidence may be introduced by the defendant, and the nature of questions to be permitted. The defendant may then offer evidence pursuant to the order of the court.'" (See *People v. Blackburn* [(1976)] 56 Cal.App.3d 685, 691.)" (*People v. Sims* (1976) 64 Cal.App.3d 544, 553-554 (*Sims*).)

Evidence Code section 782 vests broad discretion in the trial court to weigh the defendant's proffered evidence prior to its submission to the jury and to resolve the conflicting interests of the victim and the defendant. (*People v. Rioz* (1984) 161 Cal.App.3d 905, 916 (*Rioz*).) In addition, the statute reaffirms the role of Evidence Code section 352 in authorizing the trial court to exclude relevant evidence that is more prejudicial than probative. (*Ibid*.; *People v. Casas* (1986) 181 Cal.App.3d 889, 896.) The statutes do not permit the trial judge to make a credibility determination at the in camera hearing. Instead, the trial judge must evaluate the proffered evidence under the admissibility guidelines set forth in Evidence Code section 352, weighing prejudicial

14

effect versus probative value and additional evidentiary criteria. Credibility of the proffered witness is not included under these guidelines. (*Chandler*, *supra*, 56 Cal.App.4th at p. 711.)

"[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296 (*Wheeler*).) "When exercising its discretion under Evidence Code section 352, a court must always take into account, as applicable, those factors traditionally deemed pertinent in this area." (*Ibid*.) "[C]ourts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id*. at pp. 296-297, fn. omitted.) We review a trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 (*Cudjo*).)

**Analysis**

We conclude defendant has forfeited his challenge to exclusion of the 1997 misdemeanor prostitution convictions and to the alleged exclusion of evidence that Diedra worked as a prostitute in the recent past on several grounds.

First, the trial court did not rule on the issue of evidence that Diedra worked as a prostitute in the recent past. Defendant's arguments do not persuade us that the court intended to rule on this issue. The trial court stated: "[T]he fact that someone suffered . . . two misdemeanor convictions for prostitution 17 years ago, I think that the probative value is very minimal. [¶] In addition, even *trying to get there* by asking her, well, isn't it true that you have been a prostitute in the past, I don't see what the relevance of that that [*sic*] is as to what happened on that night." (emphasis added.) The trial court made no mention of the "recent past" in its ruling. It was specifically addressing the issue of the 17-year-old misdemeanor prostitution convictions as raised by the prosecution, and clarifying that it did not matter how defendant intended to introduce the evidence. It

determined that the misdemeanor prostitution convictions simply did not have sufficient relevance to be admitted in light of other considerations. Even if defense counsel believed evidence of Diedra's recent past prostitution was excluded by the court's ruling, he failed to preserve the issue for appeal because he did not press for a definitive ruling from the trial court. (*People v. Morris* (1991) 53 Cal.3d 152, 195, disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

Second, defendant forfeited his argument because he made no offer of proof as to whether Diedra had worked as a prostitute in the recent past, up to the day before the incident. "'It is the burden of the proponent of evidence to establish its relevance through an offer of proof or otherwise,' and a specific offer of proof is necessary in order to preserve an evidentiary ruling for appeal. [Citation.] 'An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.] To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued.' [Citation.]" (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1332.) Defense counsel gave no explanation of what proof he intended to offer other the 1997 misdemeanor prostitution convictions, let alone a specific explanation of the evidence.

Third, defense counsel did not file a written motion or otherwise comply with the procedures of Evidence Code section 782 with respect to either the 1997 prostitution convictions or any evidence of recent prostitution Diedra may have engaged in. Defendant is therefore precluded from complaining of error in the trial court's exclusion of such evidence. (See *Sims*, *supra*, 64 Cal.App.3d at p. 554 [defendant failed to file an affidavit or written motion as required by Evidence Code section 782 and therefore cannot complain of error on appeal].)

To avoid forfeiture, defendant argues that counsel's inaction denied him the effective assistance of counsel. We disagree.

16

"To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that this deficient performance caused prejudice in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' [Citations.] If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. [Citation.]" (*People v. Kipp* (2001) 26 Cal.4th 1100, 1122-1123.)

"'If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus.' (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)" (*People v. Gray* (2005) 37 Cal.4th 168, 207.)

Here, the record is silent regarding the reason for counsel's failure to object more explicitly or follow the procedure required in Evidence Code section 782. Accordingly, the issue is more appropriately raised in a petition for writ of habeas corpus.

Moreover, defendant has not carried his burden of establishing prejudice. (Cal. Const., art. VI, § 13.) The probative value of the 1997 prostitution convictions was minimal. As the trial court stated, the convictions were very remote in time. It would be pure speculation to infer that because Diedra had prostituted herself then, she was necessarily prostituting herself 17 years later on the night of the crimes, or that her crimes of moral turpitude in 1997 were relevant to her veracity in 2012. This case is not analogous to *People v. Varona* (1983) 143 Cal.App.3d 566 (*Varona*), and *People v. Randle* (1982) 130 Cal.App.3d 286 (*Randle*), as defendant urges. Both *Verona* and *Randle* involved conduct that was close in time to the charged crimes and similar in nature. In *Varona*, the defendants were found guilty of rape, oral copulation, and false

imprisonment. The defendants claimed the victim solicited them and agreed to engage in sex acts for money, but became angry when defendants did not pay her. The appellate court held that the trial court erred in excluding evidence that the victim had pled guilty to prostitution, was on probation for that conviction at the time of the crimes, had frequented the area where the crimes occurred while working as a prostitute, and specialized in oral copulation in addition to sexual intercourse. (*Varona*, *supra*, at pp. 569-570.) In *Randle*, the defendant was accused of forcing the victim to orally copulate him in a bar restroom after the two danced and the victim had several drinks. (*Randle*, *supra*, at pp. 289-290.) A new trial was ordered after discovery of voluminous evidence of the victim's habit of soliciting public sex acts in exchange for money and drinks. (*Id*. at pp. 293-294.) The circumstances in *Varona* and *Randle* are in no way comparable to the instant case.

Here, there is no evidence of similarity or connection between the misdemeanor prostitution convictions and the crimes. The slight probative value of the prior convictions is substantially outweighed by the prejudicial risk of evoking "an emotional bias against [the victim]." (*People v. Yu* (1983) 143 Cal.App.3d, 358, 377.) Questioning Diedra broadly about her prostitution activities in the "recent past" with no evidence that she had engaged in prostitution in the 15 years before trial would have the effect of impermissibly placing Diedra on trial. (See *Rioz*, *supra*, 161 Cal.App.3d at p. 916.) The trial court could reasonably conclude this line of questioning would unduly consume time at trial and confuse the jury by causing it to focus on collateral issues. Because the relevance for impeachment was slight and its potential for prejudice, undue consumption of time, and confusion of the jury was significant, the trial court did not abuse its discretion in refusing to admit the 1997 misdemeanor prostitution convictions or any unspecified evidence regarding the possibility of more recent prostitution.

Defendant argues that the exclusion of evidence denied him his constitutional Sixth and Fourteenth Amendment rights to present a defense and to confrontation. These arguments were not raised below and are forfeited. Even if the issues are properly before us on appeal, we conclude defendant's arguments are without merit.

18

The trial court properly applied state evidentiary law, which did not impinge on defendant's due process rights. (See *People v. Riccardi* (2012) 54 Cal.4th 758, 809.) Moreover, defendant was not denied his right to confrontation. Defendant was not prevented from presenting relevant evidence. He was permitted to ask Diedra if she was working as a prostitute on the night of the crime. He presented evidence in support of his theory that Diedra was working as a prostitute that night. Defendant testified to his version of events, and evidence of Diedra's conduct on the night of the crimes was admitted. The jury was told that Diedra was very drunk and in an area where defendant had solicited prostitutes in the past. She claimed to have decided to hitchhike despite the fact that her car was parked across the street from the bar, and despite the fact that she lived only a mile and a half away. She flagged defendant down on the highway. She voluntarily entered his van at night, although he was a complete stranger to her. The jury heard from both defendant and Diedra that defendant tried to pay her for the sexual acts that occurred. In sum, there was no evidence with more than minimal probative value that defendant was prevented from introducing in support of his defense. Defendant's constitutional rights were not violated. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 999 ["Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right"].)

Even if the trial court had erred in excluding the 1997 prostitution misdemeanors, there has been no miscarriage of justice. "Although defendant asserts the standard of review is the 'harmless beyond a reasonable doubt' standard prescribed in *Chapman v. California* (1967) 386 U.S. 18, 24 [(*Chapman*)], we have held the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under the 'reasonable probability' standard of [*People v.*] *Watson* [(1956)] 46 Cal.2d [818,] 836 [(*Watson*)]. [Citations.] Although we apply *Watson*, we note that the result would be the same under *Chapman*." (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.)

The evidence in support of defendant's convictions was overwhelming. Diedra's testimony was corroborated by the police investigation. She testified that defendant used a condom when he inserted his penis into her vagina. A box of condoms was discovered in the center console of the van. A used condom was also discovered inside the vehicle. Testing revealed that it had both parties' DNA on the interior and the exterior, as would have been the case if Diedra's story was true. Defendant's veracity was seriously undermined by the condom and DNA evidence, as he had testified that he did not have any condoms in the van, had not used a condom with Diedra, and had not had sexual intercourse with Diedra. Defendant was adamant that it was "impossible" for his and Diedra's DNA would be found on the used condom. His protestations that such evidence would not be found in his van brought the rest of his testimony into serious question. Additionally, Deputy Navarro testified that Diedra was so emotionally distraught when she tried to question her that she had difficulty speaking. It took Diedra 20 minutes to calm down enough for the deputy to interview her, consistent with the trauma Diedra claimed to have suffered.

Tammy's testimony was also corroborated. When Deputy Forbes arrived she was hysterical, out of breath, and crying. Her hair was messed up and she was shoeless, consistent with her account of events. Tammy took the deputy back to her truck, which was parked on the side of the road on Sierra Highway, as she had told him it was when defendant picked her up. She retraced the route defendant took her with the deputy, and when they arrived at the location where defendant had parked the van, they found her flip flops, which she had told the deputy came off as she fled. A search of defendant's van revealed a gas can inside, which was identical to the one Tammy had described leaving there. At trial she identified a photograph of the gas can as "definitely" hers.

The circumstances of the attacks described by the women were very similar. Defendant picked up both Tammy and Diedra in a van on Sierra Highway in the evening, when they were alone, weeks apart. Both women were obviously vulnerable. Tammy had car trouble, while Diedra was inebriated. Defendant told both women that he would give them a ride home, but that he had to stop somewhere first. He drove both women to

20

dark, secluded areas. He threatened them similarly, saying, "Bitch, get in the back and get naked" to Tammy, and "Bitch, get in the back and take your clothes off" to Diedra.

In light of the overwhelming evidence against him, it is not "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.) Any error was also "harmless beyond a reasonable doubt." (*Chapman*, *supra*, 386 U.S. at p. 24.) We conclude that the exclusion of the prior prostitution evidence, and defense counsel's failure to preserve the issues for appeal, were not prejudicial and did not violate defendant's constitutional rights.

### *Exclusion of Diedra's Other Convictions and Tammy's Misdemeanor Arrest*

Defendant also challenges the trial court's exclusion of Diedra's other convictions and Tammy's misdemeanor arrest. We conclude the contentions are not meritorious, and any error was harmless.

#### Relevant Proceedings

Prior to trial, the prosecutor also moved to exclude Diedra's 1992 conviction for burglary (§ 459), 1997 conviction for hit and run (Veh. Code, § 20001), and 2003 misdemeanor conviction for assault with a deadly weapon (§ 245), arguing that the convictions were too remote in time to have significant probative value. Defense counsel sought to use the prior convictions for impeachment.

The trial court ruled:

"I will allow the defense to impeach with the [Penal Code section] 245 [conviction] from 2003, although that also is remote in time. [¶] I do believe the victim shouldn't be given an enhanced aura of veracity or having a clean record just because it has been so long, so I'll let you impeach with that last misdemeanor if you choose to do so. [¶] As far as the cases from the 1990's, they are simply too remote and any probative value as the years go on and as she remains crime free or conviction free becomes less

21

and less probative, so I'll allow you to impeach with the most recent one. The others are excluded."[3]

The prosecutor then moved to exclude evidence of Tammy's 2006 arrest for grand theft (§ 487, subd. (a)), which the defense sought to admit as impeachment evidence. The trial court excluded the evidence:

"It's only an arrest. It's not a conviction. Again, in terms of all of the analysis under [Evidence Code section] 352, any minimal probative value is substantially outweighed by the undue consumption of time and confusion of issues, especially when we're talking about a 2006 arrest and that's the only information that we have."

**Analysis**

A misdemeanor conviction for a crime of moral turpitude is admissible for impeachment purposes where its probative value is not outweighed by prejudice, undue consumption of time, or the possibility of confusing the jury. (*Duran*, *supra*, 97 Cal.App.4th at p. 1461; see Evid. Code, § 452.5.) We review the trial court's exclusion of evidence for abuse of discretion. (*Cudjo*, *supra*, 6 Cal.4th at p. 609.)

We conclude the trial court did not abuse its discretion with respect to Diedra's misdemeanor convictions. Diedra's convictions for burglary and hit and run were remote in time. Just as the 1997 misdemeanor prostitution convictions had little relevance in 2012, her other convictions for crimes of moral turpitude in 1992 and 1997 had limited relevance to her credibility 15 or more years later. Even considered together with the conviction in 2003 for assault with a deadly weapon, the trial court could reasonably conclude there is not a continued pattern of dishonesty, given the large gap in years between the crimes. Introducing evidence of misdemeanors with little relevance to

---

[3] The trial court also excluded Diedra's 2003 arrest for unlawful possession of a controlled substance (Health & Saf. Code, § 11350). Defendant does not challenge that ruling.

22

Diedra's veracity so many years later would necessarily confuse the issues for the jury and unduly consume time at trial.

With respect to Tammy's 2006 arrest for grand theft, evidence of prior arrests is inadmissible to impeach a witness. (*People v. Anderson* (1978) 20 Cal.3d 647, 650; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523 ["it is established that evidence of mere arrests is inadmissible because it is more prejudicial than probative"].) Defendant argues for the first time on appeal that the conduct underlying the arrest is admissible. Having not raised the issue with the trial court, he has failed to preserve it for appeal. (Evid. Code, § 354.) The trial court did not abuse its discretion.

Finally, any error in excluding this evidence was harmless, for the reasons discussed above.

*Exclusion of Maria's Misdemeanor Conviction*

Defendant contends that the trial court erred in requiring him to present evidence of the conduct underlying Maria's 2008 misdemeanor conviction for theft (§ 484), rather than admitting her conviction. Without addressing the merits of the contention, we hold that any error was harmless.

**Relevant Proceedings**

Outside the presence of the jury, defense counsel raised the issue of admission of Maria's prior conviction. Defense counsel stated that the prosecutor indicated Maria may have had a 2008 conviction, which he intended to use for impeachment. The prosecutor verified that Maria did, in fact, have a conviction for theft (§ 484) in 2008. The prosecutor argued that the conviction was remote and irrelevant. The court ruled:

"I don't think it is remote and it is relevant insofar as it is a theft-related offense. It goes to credibility so I will allow the impeachment. Obviously because it's a

23

misdemeanor you have to ask about the conduct as opposed to the conviction, [defense counsel]."

Defendant did not cross-examine Maria regarding the facts underlying her prior theft conviction.

**Analysis**

Theft is a crime of moral turpitude, relevant to a witness's credibility. (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.) Prior to 1996, moral turpitude relating to misdemeanors had to be proven through evidence of the underlying conduct, as the conviction itself was inadmissible hearsay. (*Wheeler*, *supra*, 4 Cal.4th at pp. 298-299.) As noted above, after the decision in *Wheeler*, the legislature has made misdemeanor convictions admissible to prove both "the fact of conviction, [and] … that the offense reflected in the record occurred" under an exception to the hearsay rule. (*Duran*, *supra*, 97 Cal.App.4th at p. 1461; see Evid. Code, § 452.5.)

Defendant argues the trial court's ruling demonstrates that the court failed to take into account the change in the law permitting admission of the misdemeanor conviction, rather than limiting proof to the underlying conduct. While the court's comments are arguably susceptible to defendant's interpretation, the point is not entirely clear, as defense counsel did not cite Evidence Code section 452.5 or *Duran*, *supra*, 97 Cal.App.4th 1448, at the hearing on admissibility of the theft prior conviction.

In any event, error, if any, was harmless. Defendant did not even cross-examine Maria about the conduct leading to the prior conviction. As set forth in detail earlier, the evidence of defendant's guilt was overwhelming. Given the state of the record, we cannot envision any circumstance in which admission of the relatively trivial fact of Maria's prior conviction could reasonably have lead to a result more favorable to defendant.

24

*Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct in closing argument, by characterizing documents that defendant referred to while testifying as a "script," and by questioning defendant regarding the names of his drug dealers and fellow drug users on cross-examination. He further asserts that, as to the prosecutor's comments in summation, the court committed trial error by overruling his objections. The Attorney General argues that defendant forfeited the claims by failing to object to the alleged acts of misconduct on the same grounds or to request that the jury be admonished to disregard the alleged improprieties, and that the contentions lack merit. We agree with the Attorney General.

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'" [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial. [Citation.] In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review. [Citation.]' [Citation.]" (*People v. Parson* (2008) 44 Cal.4th 332, 359.)

**Prosecutor's Rebuttal Argument**

*Relevant Proceedings*

The record shows that twice during his testimony, defendant looked at documents that he had with him on the witness stand. This first instance occurred during direct

25

examination, when defendant was giving the location where a conversation he had with Diedra took place:

"[Defense counsel:] Now, after she said, you know, take care of me and I'll take care of you, what happened next?

"[Defendant:]  Got to the – J – is that 4 – J-4.

"[Prosecutor:]  Your Honor, I'm sorry, is he referring to something?

"[The Court:]  He is.  He does appear to have some sort of booklet up here, counsel, that he's referring to.  [¶]  Sir, if you are going to refresh your recollection with anything, you need to let me know that you are refreshing your recollection and, counsel, you are both entitled to look at whatever it is that he is refreshing his recollection with, if you care to do so.

"[Prosecutor:]  I would like to.  Thank you.

"[Defense counsel:]  Yeah.

(Brief pause in the proceedings.)

"[Prosecutor:]   I would just ask that we place this out of his view.  If he needs it –

"[Defense counsel:]  That's fine.  If he needs something, he can ask."

Later, on cross-examination, the prosecutor asked defendant if he needed to refer to the papers to refresh his recollection of his father's address:

"[Prosecutor:]  What is his address?

"[Defendant:]  I got it in my book.

"[Prosecutor:]  Would you like to look at your book?

"[Defendant:]  Yes.

"[Prosecutor:]  Would it refresh your recollection?

"[Defendant:]  You said what's my pop's address?

"[Prosecutor:]  Yes.

"[Defendant:]  I have it in my folder.

"[Prosecutor:]  With the Court's permission.

"[The Court:]  Sure.

(Brief pause in the proceedings.)

26

"[Defendant:]  You want the phone number too?

"[The Court:]  She just asked for the address.

"[Defendant provides address.]"

In her rebuttal summation, the prosecutor referred to the papers defendant had consulted:

"[Prosecutor:]  Again, the defendant [was] willfully false when he testified.  In fact he had to have his story written down in his little book that he brought up to the witness stand and would have kept looking at the book had I not noticed him looking down every time he needed to confirm his statement or answer, and the judge actually saw that he had his book out and he was referring to it where he had his little script for his testimony.

"[Defense counsel:]  Your Honor, objection; misstates; not in evidence.

"[The Court:]  Overruled."

### *Analysis*

Defendant forfeited his argument that the prosecutor committed misconduct by characterizing the papers he consulted as a "script."  Defense counsel objected on the basis that the argument "misstates; not in evidence."  He did not object on the basis that the prosecutor's argument rose to the level of misconduct, nor did he request an admonition.  The issue was not preserved for review.  (See *People v. Alfaro* (2007) 41 Cal.4th 1277, 1328 (*Alfaro*).)

This is not a case where the prosecutor's actions rendered the trial fundamentally unfair or where an admonition would not have cured the alleged harm.  "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."  (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*).)  "Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial.  (*People v. Lucas* (1995) 12 Cal.4th 415, 473.)

Whether the inferences the prosecutor draws are reasonable is for the jury to decide. (*Id.* at p. 474.) Harsh and vivid attacks on the credibility of opposing witnesses are permitted, and counsel can argue from the evidence that a witness's testimony is unsound, unbelievable, or even a patent lie. (*People v. Arias* (1996) 13 Cal.4th 92, 162.) . . . [W]e must view the [prosecutor's] statements in the context of the argument as a whole. (*People v. Lucas*, *supra*, 12 Cal.4th at p. 475.)" (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

We cannot conclude there is a reasonable likelihood that the jury would have "construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra,* 25 Cal.4th at p. 44.) The record shows that defendant consulted the documents twice to refresh his memory as to specific locations. Although the prosecutor reviewed the documents after the first instance, her reaction before the jury was mild. The court, prosecutor, and defense counsel agreed that the documents would be set aside, but that defendant could use them again if necessary to refresh his recollection. The documents were removed from defendant's view, and he continued to testify to the details of the incidents unaided until he had trouble recalling an address on cross-examination. At that point, the prosecutor volunteered that defendant could refer to the documents to help him recall the address, and the court allowed defendant to do so. It is not unusual for witnesses to refresh their recollections of matters like times, dates, and addresses, as did other witnesses in this case, including Deputy Navarro. It was clear that the trial court sanctioned the use of the documents for this purpose, as it specifically stated that defendant was free to view the documents to refresh his recollection. The logical inference for the jury to draw from these facts is that the documents served a proper purpose in the trial as a means of assisting a witness in remembering relatively innocuous facts.

The prosecutor's remarks were a fleeting passage in the context of her entire closing argument. Prosecutors are permitted and expected to attack the credibility of witnesses for the defense, including the defendant. A reasonable juror would have recognized that the prosecutor's single reference to a "script," was a platitude used to

28

support her position.  The jurors were instructed that they must "determine what facts have been proved from the evidence received in the trial and not from any other source," (CALJIC No. 1.00), and that "[s]tatements made by the attorneys during the trial are not evidence" (CALJIC No. 1.02).  Jurors are presumed to be intelligent and capable of correctly understanding the court's instructions.  (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  We presume the jury followed its instructions here, and there is not a reasonable likelihood that the jury would have "construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales*, *supra*, 25 Cal.4th at p. 44.)  There was no prosecutorial misconduct with respect to the prosecutor's closing argument.

Defendant asserts that the prosecutor's comments regarding the court's knowledge of the substance of the documents lent credence to the prosecutor's characterization of the documents as a "script."  He contends that the court committed trial error by overruling his objections and allowing the jury to believe that the court agreed with the prosecutor's assessment.  This contention fails for the same reasons.  The court allowed defendant to consult the documents to refresh his memory of dates.  Had the court believed defendant was reading a "script," it would not have permitted defendant to consult them.  The logical inference is that the court did not believe that the documents were improper or a "script."

**Cross-Examination Regarding Drug Dealers and Users**

*Relevant Proceedings*

On cross-examination, the prosecutor questioned defendant about the names of the people who sold him the crack cocaine he claimed to have been using in September of 2012, when the incidents with Tammy and Diedra occurred:

"[Prosecutor:]  Where did you get the crack [cocaine]?

"[Defendant:]  I bought it.

29

"[Prosecutor:]  From who?

"[Defendant:]  Certain individuals.

"[Defense counsel:]  Objection; relevance.

"[The Court:]  I'm sorry?

"[Defense counsel:]  Objection; relevance.

"[The Court:]  Overruled.

"[Prosecutor:]  You can answer.

"[Defendant:]  A certain individual.

"[Prosecutor:]  Who?

"[Defendant:]  Whoever.

"[Defense counsel:]  Objection; relevance.

"[The Court:]  Overruled.

"[Defendant:]  I don't know his name."

Later, the prosecutor questioned defendant about the names of the people he claimed to have been using drugs with prior to picking up Diedra:

"[Prosecutor:]  Who were they?

"[Defendant:]  Some people I knew.

"[Prosecutor:]  Who were they?

"[Defendant:]  Someone I knew.

"[Prosecutor:]  What are their names?

"[Defendant:]  I don't know their real names.

"[Prosecutor:]  How did you know them?

"[Defendant:]  I know them by street names.

"[Prosecutor:]  What names?

"[Defendant:]  I'm not giving any names up.

"[The Court:]  Sir, I'm going to order you to answer the question.

"[Prosecutor:]  I don't know the names.  I don't know the names.

"[The Court:]  She asked you what names you knew them by.

"[Defendant:]  One name Rock.

30

"[Prosecutor:] Who else?

"[Defendant:] The other one named Eight.

"[Prosecutor:] Eight?

"[Defendant:] Eight.

"[Prosecutor:] As in the number?

"[Defendant:] Yes.

"[Prosecutor:] What is the female's name?

"[Defendant:] I never knew her name.

"[Prosecutor:] And you were doing crack with them?

"[Defendant:] Right."


*Analysis*


Again, defendant forfeited his claim by failing to object on the ground of prosecutorial misconduct at trial, and by failing to request an admonition. (See *Alfaro, supra,* 41 Cal.4th at p. 1328.) The only objections he made were related to the questioning about his drug dealers, and those objections were based on relevance. Defendant's contention would fail even if it had been preserved, however, as the prosecutor did nothing improper.

"'[W]hen a defendant voluntarily testifies in his own defense the People may "fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." [Citation.]' [Citation.]" (*People v. Reynolds* (1984) 152 Cal.App.3d 42, 46 (*Reynolds*).) "[T]he right of cross-examination takes on added significance where the witness's credibility is of special significance to the proceedings." (*People v. Seminoff* (2008) 159 Cal.App.4th 518, 526-527.) "A [d]efendant's refusal to answer relevant questions . . . . deprive[s] the prosecution its right to subject that claim to 'the greatest legal engine ever

31

invented for the discovery of truth,' cross-examination.  [Citation.]"  (*Reynolds*, *supra*, at p. 46.)

In this case, Tammy and Diedra both testified that they encountered defendant because he offered assistance when they were alone and in need of help.  Neither woman testified to being with defendant for any other purpose, or to voluntarily engaging in illicit activities while in defendant's company.  Neither consented to any sexual activity with defendant.  In contrast, defendant testified that both women got into his van because they were prostitutes who wanted to use drugs with him, and exchange sex for drugs.  According to defendant, any sexual activities that occurred were consensual.  Defendant's testimony that he was in possession of drugs offered an alternate explanation as to why Tammy and Diedra would get into a van with a strange man at night.  His testimony that Diedra became furious with him when they ran out of drugs provided a possible motive for her to lie about being raped.  Credibility was a central issue in the case, and defendant brought his own credibility into question by choosing to testify to his version of events.  Who he obtained the drugs from and who he used them with were relevant questions that defendant should have been readily able to answer if he was testifying truthfully.

Although defendant may have legitimately feared retaliation from the "drug underworld" as he claims, he is not exempted from cross-examination on that basis.  (See, e.g., *Reynolds*, *supra*, 152 Cal.App.3d at p. 46 ["no legal exemption from cross-examination" due to fear that other inmates would label defendant a snitch if he named them].)  The prosecutor properly questioned defendant on the circumstances surrounding the two rapes.  There was no misconduct.

*Cumulative Prejudicial Error*

Defendant contends the cumulative prejudicial effect of the alleged errors raised above requires the reversal of his conviction.  We have rejected defendant's claims of error, except one in which the record is ambiguous and the purported error was so trivial

as to not warrant a discussion of the merits. Defendant's trial was not fundamentally unfair. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1056.)

### *Evidence Supporting One of Defendant's Recidivist Prior Convictions Enhancements*

Defendant contends that one of the five-year enhancements for prior serious felony convictions must be stricken. He argues that two of the prior charges—rape (§ 261, subd. (a)(2)) and rape in concert (§ 264.1)—were not brought and tried separately. The Attorney General concedes the issue, and we agree. [4]

Section 667, subdivision (a)(1) provides: "[A]ny person convicted of a serious felony who previously has been convicted of a serious felony in this state or of any offense committed in another jurisdiction which includes all of the elements of any serious felony, shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively." "Brought and tried separately" means that "the underlying proceedings must have been formally distinct, from filing to adjudication of guilt." (*In re Harris* (1989) 49 Cal.3d 131, 136; *People v. Wagner* (1994) 21 Cal.App.4th 729, 737). "[A] court may look to the record of conviction to determine whether the defendant's prior serious felony convictions were sustained 'on charges brought and tried separately . . .' [Citation.]" (*People v. Wilson* (2013) 219 Cal.App.4th 500, 510.)

In this case, the prosecutor introduced into evidence two section 969, subdivision (b) packets from the Department of Corrections and Rehabilitation. The evidence relating to defendant's prior convictions for rape and rape in concert consisted of an abstract of judgment and an information. The abstract of judgment shows that defendant was convicted of one count of rape and one count of rape in concert on May 8, 1991, in

---

[4] Defendant does not challenge the section 667, subdivision (a)(1) enhancement imposed on the basis of his prior robbery conviction (§ 211) in case number A765883.

33

case number MA002638.  Further proof that the two rape charges were not brought and tried separately is found in the felony information in case No. MA002638.  Defendant was charged in that information in count 1 with forcible rape while acting in concert and in count 2 with forcible rape.

Based on this evidence, defendant was convicted and sentenced for rape and rape in concert in the same proceeding.  Because these prior felonies were not brought and tried separately, the trial court upon issuance of the remittitur must dismiss one of the five-year enhancements stemming from case No. MA002638 and issue an amended abstract of judgment reflecting the change.

### *Imposition of Consecutive Sentences for Criminal Threats*

Defendant contends the sentences imposed on the charges of criminal threats in counts 4 and 6 must be stayed because the threats were part of the force and fear used for the underlying sexual assaults against Tammy and Diedra.  We agree that the sentence imposed in count 6 must be stayed pursuant to section 654.  Section 654 does not require that the sentence imposed in count 4 be stayed, however, as substantial evidence supports the trial court's implied finding that defendant's course of conduct was divisible.

Section 654, subdivision (a) provides, in pertinent part:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  In *Neal v. State of California* (1960) 55 Cal.2d 11 (*Neal*), our Supreme Court "expanded the meaning of section 654 to apply to more than one criminal act when there is a course of conduct that violates more than one statute but nevertheless constitutes an indivisible transaction." (*People v. Hairston* (2009) 174 Cal.App.4th 231, 240.)  In determining whether a course of conduct consisting of multiple acts is indivisible, we look to the "defendant's intent and objective." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one

34

objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*Ibid*.) On the other hand, "[i]f [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

"[S]ection 654 serves to match a defendant's culpability with punishment." (*People v. Yang Vang* (2010) 184 Cal.App.4th 912, 915.) "[D]ecisions . . . have refined and limited application of the 'one intent and objective' test, in part because of concerns that the test often defeats its own purpose because it does not necessarily ensure that a defendant's punishment will be commensurate with his culpability." (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253.) As our Supreme Court noted in *People v. Latimer* (1993) 5 Cal.4th 1203, 1211-1212, the cases following *Neal* have "limited the rule's application in various ways," including, in some cases, by "narrowly interpret[ing] the length of time the defendant had a specific objective, and thereby [concluding] similar but *consecutive* objectives permit[ed] multiple punishment." Under such circumstances, "[i]f the separation in time afforded [the] defendant[] an opportunity to reflect and to renew [his] intent before committing the next crime, a new and separate crime [wa]s committed." (*People v. Louie* (2012) 203 Cal.App.4th 388, 399.)

"The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination. Its findings on this question must be upheld on appeal if there is any substantial evidence to support them. [Citations.]" (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312 (*Hutchins*).) "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) "'"We must 'view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from

the evidence. [Citation.]' [Citation.]" [Citation.]' (*Hutchins*, *supra*, 90 Cal.App.4th at pp. 1312-1313.)" (*People v. Tarris* (2009) 180 Cal.App.4th 612, 627.)

### Criminal Threats Against Tammy (Count 6)

With respect to Tammy, the jury convicted defendant in count 5 of assault with intent to commit rape or oral copulation and in count 6 of criminal threats. The trial court imposed separate, consecutive sentences, stating: "In terms of the victim in count 5 and count 6, again between the assault with the knife and the threat being made for the [section] 422 and also the actual assault and kidnaping type behavior, there is enough time and space that separates each of those things to just [*sic*] the consecutive term."

Making criminal threats is a specific intent crime that occurs when the defendant "willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out . . . ." (§ 422.) Section 422 was enacted to punish those who try to instill fear in others. (*People v. Felix* (2001) 92 Cal.App.4th 905, 913.) The intent required by section 422 is not the intent to actually carry out the threatened crime, but the intent that the victim receive and understand the threat. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 806.)

Assault with intent to commit rape or oral copulation is an "unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another" (§ 240) with the intent to commit either rape or orally copulation the victim (§ 220, subd. (a)(1)). "Ordinarily, '[a]n assault occurs whenever "'[t]he next movement would, at least to all appearance, complete the battery.'" [Citation.]' [Citation.] But there can also be an assault when the battery is only threatened. [Citation.] '"Where a party puts in a condition which must be at once performed, and which condition he has no right to impose, and his intent is immediately to enforce performance by violence, and he places himself in a position to do so, and proceeds as far as it is then necessary for him to go in order to carry out his intention, then it is as much an assault as if he actually struck, or

36

shot, at the other party, and missed him.'" [Citation.]" (*People v. Page* (2004) 123 Cal.App.4th 1466, 1473 (*Page*).)

In this case, the prosecutor relied on a conditional threat theory of assault, and the jury was accordingly instructed under CALJIC 9.00.1, which applies to cases in which a conditional threat constitutes the assault.[5] In convicting defendant pursuant to section 240, the jury necessarily found that defendant intended to threaten Tammy for the purpose of committing oral copulation or rape. No evidence was presented that defendant had an objective in committing criminal threats that was not also his objective in committing assault with intent to commit rape or oral copulation, so we cannot conclude that the crimes were not part of a single course of conduct on this basis.

Additionally, there was no temporal separation between the two crimes. Tammy testified that the entire incident occurred very quickly: Defendant got out of the driver's seat, put his leg between her legs, and put his hand around her throat. He held something sharp to her neck and said, "Bitch, get in the back and get naked." Tammy asked if he was joking, and he immediately responded, "Bitch, get in the back and get naked; otherwise, I'll kill you." Defendant set the sharp object down behind the seat, but picked it up and held it to her neck again when Tammy reached for the door. He again said, "Bitch, get in the back and get naked; otherwise I'm going to stab you." When defendant put the sharp object down a second time, Tammy was able to escape and get help.

On these facts, there is insufficient evidence to support the trial court's finding that the crimes were divisible for purposes of section 654, as there does not appear to be a

---

[5] The jury was instructed that: "An assault includes a conditional threat to apply physical force upon another, providing that: [¶] 1. The threat commands the immediate performance of some act which the threatening party has no legal right to demand; [¶] 2. The threat is made with the intention of compelling performance of that act by the application of physical force; [¶] 3. The person making the threat has placed himself physically in a position to inflict such physical force; and [¶] 4. That person has proceeded as far as it is necessary to go in order to carry out his intention."

separation between the threats and the assault.  Defendant's sentence in count 6 must therefore be stayed.

### Criminal Threats Against Diedra (Count 4)

With respect to Diedra, the jury convicted defendant in count 1 of forcible rape, in counts 2 and 3 of forcible oral copulation, and in count 4 of criminal threats.  The trial court imposed separate, consecutive sentences without discussing why the sentence in count 4 was not stayed pursuant to section 654.

Forcible rape "is an act of sexual intercourse . . . accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."  (§ 261, subd. (a)(2).)  "Oral copulation is the act of copulating the mouth of one person with the sexual organ or anus of another person" (§ 288a, subd. (a)), "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ."  (§ 288a, subd. (c)(2)).  Within the context of sexual offenses, "'duress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted."  (§ 261, subd. (b).)  "'[M]enace' means any threat, declaration, or act which shows an intention to inflict an injury upon another."  (§ 261, subd. (c).)

Defendant threatened Diedra before he committed the sexual offenses and again afterwards.  His initial use of threats to accomplish the rape and oral copulations was necessary to the jury's finding that those crimes were forcible, and no evidence was presented that he had an objective in making those threats that was not also his objective in committing the sexual offenses.  However, defendant's final threat—that he would cut Diedra's throat and watch her bleed if she did not orally copulate him again because he liked watching "bitches bleed"—was made after the sexual offenses were completed, and necessarily could not have been for the same objective.  Defendant's stated intention was

38

to commit another sexual offense or to cause Diedra bodily harm, which increased his culpability. There was substantial evidence to support imposition of a separate sentence.

Additionally, the crimes defendant committed against Diedra occurred over a significant period of time, with numerous breaks: After Diedra complied with his initial threats and undressed, defendant stopped and told her he wanted to look at her. He took the time to light a lighter to see her, and asked her how old she was before making her get into the back of the van. Defendant then made Diedra orally copulate him for "a long time," during which he repositioned himself multiple times. He stopped and talked to Diedra when she began crying and asked to be let go. When defendant demanded to orally copulate Diedra, she did not immediately comply, saying she was scared and refusing to lie down. While defendant orally copulated Diedra, he again talked to her, telling her that he would let her go when she was finished. After demanding sexual intercourse, defendant stopped to obtain and put on a condom. When defendant demanded oral sex again, and Diedra was crying too much to orally copulate him, defendant again stopped. He gave her his shirt to blow her nose, and asked her to sit next to him and talk to him. He said he would let her go after she finished. Defendant gave Diedra her bra and shirt, and allowed her time to put her bra on. He did not threaten Diedra again until she asked for her pants.

These facts support the finding that there were periods of time between the crimes in which defendant stopped and was able to reflect and form a new criminal intent. Instead of taking the opportunity to cease his prolonged attack, defendant proceeded to make an additional threat instead. We conclude the trial court's implicit determination that defendant had a separate objective in count 4 is supported by substantial evidence. Accordingly, the imposition of separate punishment for criminal threats against Diedra was appropriate.

*Evidence Supporting Criminal Threats in Count 6*

Defendant contends the evidence was insufficient to support his conviction for criminal threats in count 6 because Tammy was not in reasonable sustained fear for her own safety. There is no merit to this contention.

The Fifth and Sixth Amendments, which apply to the states through the Fourteenth Amendment, require the prosecution to prove all elements of a crime beyond a reasonable doubt. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278.) A conviction supported by insufficient evidence violates the Due Process Clause of the Fourteenth Amendment and must be reversed. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-319.) The same is true of enhancements. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

Pursuant to section 422, a person is guilty of criminal threats if he "willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety."

To establish the "sustained fear" element, "the statute . . . requires proof of a mental element in the victim." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).) "Sustained fear" is fear that is more than "momentary, fleeting, or transitory." (*Ibid*.) The fear must also be reasonable. (§ 422; *People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)

Defendant argues that Tammy was not in sustained fear because she left the scene quickly, and did not look back to see if defendant was pursuing her. He asserts that she was no longer in danger after running a few blocks because there was no evidence that defendant had a long-range weapon or that he could find her in the future. We disagree.

Defendant assaulted Tammy with the intent of raping her or subjecting her to oral copulation. Even defendant does not appear to contest that from the moment Tammy understood what was happening until she was able to escape the van she was terrified. She testified she was "scared to death" as she thought of a way to escape the van. Tammy was so afraid that she did not retrieve her gas can, lost her sandals while running, and continued to run barefoot in an industrial area. She tried desperately to flag down anyone she could, but could not get anyone to stop, so she ran barefoot for over a half of a mile past closed businesses to reach the Panda Express, where she banged on the door for the women inside to call 911. Although they called the police for her, they would not let her inside, so she waited outside, in the dark, for 45 minutes for the police to arrive. When Deputy Forbes arrived, Tammy was out of breath, crying, and hysterical. Her hair was "messed up," and she didn't have any shoes on. There was ample evidence that Tammy was subjectively afraid the entire time, which was close to an hour. The jury could reasonably conclude that an hour spent in fear of being sexually assaulted or killed is more than "momentary, fleeting, or transitory." Our courts have upheld convictions for criminal threats where the duration of the sustained fear was substantially less. (See, e.g., *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 [victim in sustained fear for approximately 15 minutes]; *Allen, supra,* 33 Cal.App.4th at p. 1156 [same].)

This same evidence amply supports the jury's finding that Tammy's fear was reasonable. Substantial evidence supports defendant's conviction for criminal threats in count 6.

41

*Evidence Supporting Weapon Enhancements*

Defendant contends there was insufficient evidence to support the weapon enhancements (§ 12022, subd. (b)(1)) appended to the charges relating to Tammy in counts 5 and 6. We apply the traditional substantial evidence standard of review in determining the sufficiency of the evidence to support enhancements. (*Albillar, supra,* 51 Cal.4th at pp. 59-60.)

Section 12022, subdivision (b)(1) provides that: "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense." To find a deadly weapon allegation true, the trier of fact must conclude that "the defendant himself intentionally displayed an instrument capable of inflicting great bodily injury or death in a menacing manner during the crime." (*In re Bartholomew D.* (2005) 131 Cal.App.4th 317, 322.) Defendant does not dispute using an object during the commission of the offenses against Tammy, but argues there was insufficient evidence to establish the object was a deadly or dangerous weapon.

Deadly weapons can include objects which "may be used as weapons but which have nondangerous uses, such as hammers and pocket knives." (*People v. Burton* (2006) 143 Cal.App.4th 447, 457.) Circumstantial evidence alone is sufficient to establish the deadly nature of an object. (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1436 (*Monjaras*).) This includes a defendant's own words and conduct in the course of the offense. (*Id.* at pp. 1436-1437.) It is not necessary that the victim see the weapon, but only that "by sensory perception, the victim is made aware of its presence." (*People v. Jacobs* (1987) 193 Cal.App.3d 375, 381 [holding that a firearm was displayed when victim was made aware of its presence by a the sound of the hammer being cocked].)

Tammy testified that defendant held "what [she] thought was a knife to [her] neck, something sharp . . . . [¶] [¶] [¶] [¶] right behind her earline" It was dark in the van so Tammy could not see what defendant was holding. Defendant threatened, "Bitch, get in

the back and get naked; otherwise, I'll kill you." Defendant put what Tammy thought was a knife down behind him, but when she reached for the door he picked it up again and held it to her neck. He threatened, "Bitch, get in the back and get naked; otherwise I'm going to stab you."

When questioned further about the object defendant used, Tammy described the sensation she felt as "a point, something that was pointy or sharp pushing into the back of my neck." She could not tell what it was made of, but when defendant put the object down the second time, she thought "it might not be a knife because it wasn't shiny or something like that." She could not see the object to know for certain.

Defendant's actions and words indicated that the sharp object he held to Tammy's neck could cause great bodily injury, specifically that he could kill or stab her with it. "There can be no doubt that a pointed object aimed at the victim's neck is capable of producing death or great bodily injury." (*In re Brandon T.* (2011) 191 Cal.App.4th 1491, 1497; see also *Page, supra,* 123 Cal.App.4th at pp. 1469, 1472 ["'sharp[,] pointy'" pencil held a deadly weapon].) "The jury was not required to give defendant the benefit of [Tammy's] inability to say conclusively [what the object was] . . . because 'defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a [deadly weapon].'" (*Monjaras*, *supra*, 164 Cal.App.4th at pp. 1436-1437, quoting *People v. Rodriguez* (1999) 20 Cal.4th 1, 13.) "[T]he jury was entitled to take defendant at his word, so to speak, and infer from his conduct that the [object was a dangerous weapon] and that he was prepared to [use it] if [Tammy] did not comply with his demand." (*Monjaras*, *supra*, at p. 1437.) Substantial evidence supports the jury's finding that defendant used a dangerous or deadly weapon in commission of counts 5 and 6.

### *Errors in the Abstract of Judgment*

Our review of the record disclosed that the abstract of judgment did not conform to the oral pronouncement of judgment as to counts 1-3. At the sentencing hearing on

March 21, 2014, the trial court orally imposed consecutive terms in counts 1-3 of 25-years-to-life pursuant to the one strike law, tripled to 75-years-to-life under the three strikes law, plus an enhancement of 15 years for three prior serious felony convictions. The abstract of judgment omits any reference to section 667.61—the one strike law—and incorrectly reflects the indeterminate terms imposed by the trial court as 25-years-to-life for counts 1-3. We invited the parties to submit further briefing on this issue.

Defendant contends that the abstract of judgment "appears" to properly reflect the trial court's oral pronouncement of judgment on these points, albeit in a round-about fashion through cross-reference. The Attorney General contends that the abstract of judgment does not conform to the court's oral pronouncement and must be corrected.

We agree with the Attorney General that the abstract of judgment does not accurately reflect the trial court's oral pronouncement, but even if we were to accept defendant's interpretation, it is clear from our review and from the responses that, at best, the meaning of the abstract of judgment on these points is unclear and confusing. The abstract of judgment must be modified to clearly reflect the oral pronouncement of judgment. (See *People v. Scott* (2012) 203 Cal.App.4th 1303, 1324 ["it is the oral *pronouncement of sentence* that constitutes the judgment"].) There is no dispute that the trial court's ruling was clear, and that any discrepancies in the abstract of judgment were clerical in nature and may be corrected on appeal. (*Ibid.* ["discrepancies between an abstract and the actual judgment as orally pronounced are subject to correction at any time, and should be corrected by a reviewing court when detected on appeal"].)

Accordingly, we order the trial court to correct the abstract of judgment to reflect that the sentences in counts 1-3 were imposed under the one strike law (§ 667.61, subds. (a) and (d)), as well as the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and that the indeterminate term on those counts is 75-years-to-life.

44

## DISPOSITION

The trial court is directed to modify the judgment as to counts 1-6 to reflect that defendant has suffered two prior serious felony convictions pursuant to section 667, subdivision (a), and impose two five-year enhancements on these counts. The abstract of judgment is ordered modified to reflect that the sentences imposed in counts 1-3 are consecutive terms of 25-years-to-life pursuant to the one strike law (§ 667.61, subds. (a) and (d)), tripled to 75-years-to-life under the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), plus two five-year serious felony prior conviction enhancements (§667, subd. (a)(1)), for an aggregate of 85-years-to-life. Additionally, the trial court is instructed to modify the judgment to stay the sentence imposed in count 6 pursuant to section 654. The clerk of the superior court shall send a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

KRIEGLER, J.

We concur:

TURNER, P. J.

GOODMAN, J.[*]

---

[*] Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

45